**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

Case Nos. 11-1089; 11-1091

JUAN C. PAGAN COLON; ADA I. RENTA-BONILLA;
CONJUGAL PARTNERSHIP PAGAN-RENTA

Plaintiffs-Appellees/Cross-Appellants,

v.

WALGREENS OF SAN PATRICIO, INC.

Defendant-Appellant/Cross-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF PUERTO RICO
Civil No. 08-02398 (GAG)

---

**BRIEF OF DEFENDANT-APPELLANT/CROSS-APPELLEE,**
**WALGREENS OF SAN PATRICIO, INC.**

---

**Gregory T. Usera**
First Circuit Bar No. 82810

**Natalia Villavicencio**
First Circuit Bar No. 109087

**USERA, FIGUEROA & GINER, P.S.C.**
PO Box 9022487
San Juan, Puerto Rico 00902-2487
Telephone: (787) 725-8080
Telefax: (787) 725-8860

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to First Circuit Rule 26.1, Defendant-Appellant Walgreens de San Patricio, Inc. identifies the following:

1.  Walgreen Co. is the parent corporation of Walgreens de San Patricio, Inc.

2.  Walgreens de San Patricio, Inc. is a wholly owned subsidiary.

3.  No publicly traded company owns 10% or more of Walgreen Co. or Walgreens de San Patricio, Inc.

**TABLE OF CONTENTS**

I.    JURISDICTIONAL STATEMENT..................................-1-

II.   STATEMENT OF ISSUES......................................-2-

III.  STATEMENT OF THE CASE....................................-2-

IV.   STATEMENT OF FACTS.......................................-4-

      A.    Pagán's Hospitalization, May 10-May 17, 2008........-4-
      B.    After Pagán's Hospital Release, May 17-May 23.......-5-
      C.    Pagán's Termination on May 24 and the DOL...........-7-
      D.    The Company's Reconsideration of the
            May 24 Termination..................................-8-
      E.    The DOL's Investigation (Part I): June 4, 2008......-8-
      F.    The June 4 Investigation that Led
            to Pagán's Termination..............................-9-
      G.    DOL Investigation (Part II): June 6, 2008..........-11-


V.    SUMMARY OF THE ARGUMENT.................................-12-

VI.   ARGUMENT................................................-13-

      A.    STANDARDS OF REVIEW................................-13-

            1.   Sufficiency of the Evidence (Rule 50) - *De Novo* -13-
            2.   New Trial (Rule 59): Abuse of Discretion .......-13-
            3.   Back pay Award (Rule 59(e)): De Novo ...........-13-

       B.   INSUFFICIENT EVIDENCE TO ESTABLISH CAUSAL
            CONNECTION BETWEEN TERMINATION AND
            ALLEGED RETALIATION UNDER FMLA....................-14-

      C.    LEGITIMATE, NON DISCRIMINATORY REASON FOR
            TERMINATION ESTABLISHED...........................-16-

      D.    INSUFFICIENT EVIDENCE TO INFER
            RETALIATORY ANIMUS OR PRETEXT ....................-23-

      E.    CALCULATION OF BACK PAY UNDER FMLA................-25-

VII.  CONCLUSION..............................................-29-

i

## TABLE OF AUTHORITIES

**A.    CASES**

Anderson v. New Orleans Jazz & Heritage Festival and
Foundation, Inc., 464 F. Supp. 2nd 562 (E.D. La. 2006)..-21-

Beal v. Rubbermaid Commercial Products, Inc.,
972 F. Supp. 1216, 1229 (S.D.Iowa 1997).................-14-

Charlesbank Equity Fund II v. Blinds to Go, Inc.,
370 F.3d 151, 158 (1st Cir.2004)..................-14-, -15-

Dowles v. Conagra, Inc.,
980 So. 2d 180 (2nd Cir. 2008).........................-21-

Fantini v. Salem State College,
557 F.3d 22, 35 (1st Cir. 2009).........................-20-

Hatchett v. Philander Smith College,
251 F. 3rd 670, 677 (8th Cir. 2001)....................-14-

Hodgens v. General Dynamics Corp.,
144 F.3d 151, 160 (1st Cir.1998).......................-17-

Jennings v. Mid American Energy Co.,
282 F. Supp. 2nd 954 (S.D. Iowa 2003)..................-18-

Johnson v. Spencer Press of Maine, Inc.,
364 F.3d 368 (1st Cir. 2004)...........................-14-

Mesnick v. General Electric Co.,
950 F.2d 816, 827 (1st Cir. 1991)......................-17-

Marcoux v. Shell Oil Products,
524 F. 3d 33, 40 (1st Cir. 2008).......................-13-

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973)....................................-17-

Monteagudo v. AEELA,
554 F.3d 164, 170 (1st Cir. 2009)......................-13-

Morgan v. Hilti, Inc.,
108 F.3d 1319 (10th Cir. 1997).........................-22-

*Moss v. Bluecross, Blue Shield of Kansas, Inc.*,
534 F. Supp. 2nd 1190 (D. Kan. 2008)......................-21-

*Nagle v. Acton Boxborough Regional School Dist.*,
576 F.3d 1, 3 (1st Cir. 2009)..........................-20-

*Pérez v. Volvo Car Corp.*,
247 F.3d 303, 319 (1st Cir.2001).......................-14-

*Rio Mar Associates, LP, SE v. UHS of Puerto Rico, Inc.*,
522 F.3d 159, 163 (2008)...............................-13-

*Satterlee v. Allen Press, Inc.*,
455 F. Supp. 2nd 1236 (D. Kan. 2006)...................-21-

*Smith v. Hope School*,
560 F. 3d 694 (7th Cir. 2009)..........................-21-

*Thorson v. Gemini, Inc.*,
205 F. 3d 370 (8th Cir. 2000).........................26-29

*United States v. George*,
448 F.3d 96, 101 (1st Cir.2006).......................-13-

*Vanmeveren v. Whirlpool*,
2003 WL 21235475......................................-21-

*Vasapolli v. Rostoff*,
39 F.3d 27, 36 (1st Cir.1994).........................-13-

*Whitfield v. Meléndez Rivera*,
431 F.3d 1, 9 (1st Cir.2005)..........................-13-

**B.    STATUTES**

1.   Federal

28 U.S.C. § 1291 .......................................-1-

28 U.S.C. § 1331. ......................................-1-

28 U.S.C. § 1367 .......................................-1-

29 C.F.R. 825.216 .....................................-20-

Family and Medical Leave Act ("FMLA"),
29 U.S.C. 2601 et seq ..............1-4,12,14,16-22,24-27,29

2.    Puerto Rico

Articles 1802 and 1803 of the Puerto Rico Civil Code,
P.R. Laws Ann. Tit. 31 §§ 5141-5142 .................-1-,-3-

Puerto Rico's Act 80 of May 30, 1976,
P.R. Laws Ann. Tit. 29 §§ 185 et seq...........-1-, -2-, -3-


**C.    RULES AND REGULATIONS**


Federal Rules of Appellate Procedure

        Rule 3.............................................-1-
        Rule 4.............................................-1-

Federal Rules of Civil Procedure

        Rule 50................................-1-, -3-,-4-,-13-
        Rule 59................................-1-, -4-,-13,-14-


**D.    OTHER AUTHORITIES**

Buckman, Deborah, <u>Award of Damages Under Family
and Medical Leave Act</u>, 176 ALR Fed 591 (2002)...........-27-

iv

## I. JURISDICTIONAL STATEMENT

A.   Subject Matter Jurisdiction is based upon federal question jurisdiction, 28 U.S.C. § 1331.   Plaintiffs-Appellees invoked the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq.  Supplemental jurisdiction was exercised under 28 U.S.C. § 1367 for claims under Puerto Rico's Unjust Dismissal Act, P.R. Laws Ann. Tit. 29 § 185 et seq. and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. Tit. 31 §§ 5141-5142. (Appendix (hereinafter, "App."), 1-6).

B.   Appellate jurisdiction is based on 28 U.S.C. § 1291 and F.R.A.P. Rules 3 and 4(a)(4). Appeal is taken from the verdict rendered by the Jury, as amended by the Court, and from the Order disposing of Walgreens' motion for judgment as a matter of law under Rule 50(b) or, alternatively, for new trial under Rule 59.  Appeal is also taken from the order denying Walgreens' Motion to Alter Judgment.(Addendum (hereinafter, "Add."), 1-14); F.R.A.P. Rule 4(a)(4)(A)(i),(iv)-(v).

C.   The finality and timeliness of the appeal is established by the Judgment  (10/25/10)(Add. 3); Renewed Motion under Rules 50 and 59  (11/04/10)(Add.  65-98);  Motion  under  Rule  59 (e)(11/04/10)(Add. 59-64); Order on Motion under Rules 50 and 59 (11/8/10) (Add. 6); Order on Motion under Rule 59 (e)(12/7/10)(Add. 7-13); Amended Judgment (12/7/10)(Add. 14); Notice of Appeal (12/27/10)(App. 110-111).

1

D.   This appeal is from the District Court's final orders disposing of Pagán's FMLA retaliation claim.

## II. STATEMENT OF ISSUES

1.   Whether there was sufficient evidence to establish a causal connection under FMLA between the protected activity and the adverse employment decision.

2.   Whether there was sufficient evidence to sustain that the reason proffered by Walgreens for Pagán's termination was legitimate and non-discriminatory.

3.   Whether there was sufficient evidence to support a finding of retaliatory animus and pretext under FMLA.

4.   Whether the Court's award of back pay should have included compensation for overtime hours potentially worked by Pagán.

5.   In the alternative, whether the Court should have used the stipulation between the parties regarding the amount of hours worked by Pagán the year before his termination as the basis to calculate overtime hours for the back pay award.

## III. STATEMENT OF THE CASE

Plaintiffs Juan C. Pagán Colón (hereinafter, "Pagán"), Ada I. Renta-Bonilla, and the conjugal partnership constituted between them (collectively, "Plaintiffs") filed a complaint against Walgreens claiming: (1) retaliation under the Family Medical Leave Act, 29 U.S.C.A. §§2601 et seq. (hereinafter, "FMLA"); (2) wrongful termination under Puerto Rico's Law 80 of May 30, 1976, P.R. Laws

2

Ann., Tit. 29 §§185(a) et seq. (hereinafter, "Law 80"); and (3) damages under Articles 1802 and 1803 of the Civil Code of Puerto Rico. Plaintiffs' damages claims under Articles 1802 and 1803 of the Civil Code of Puerto Rico were dismissed with prejudice as a consequence of the dispositive motions filed by Walgreens. (App. 7-22).

Trial began on October 18, 2010. Pagán's wrongful termination claim under Law 80 was voluntarily dismissed with prejudice during the course of trial. (App. 23). Therefore, out of the three claims filed in the Complaint, the only one that the Jury evaluated was Pagán's retaliation claim under FMLA. At the close of Pagán's case in chief, Walgreens moved for judgment as a matter of law under Rule 50, but the Court reserved its ruling. (App. 150-167). Walgreens proceeded with its defense and at the close of all the evidence renewed its Rule 50 motion, however, the Court decided to leave the FMLA finding to the jury. (App. 265-275).

On October 25, 2010, the jury rendered a verdict in favor of Pagán and awarded him $100,000.00 in compensatory damages under FMLA. (Add. 3). The Court *sua sponte* ordered a *remittitur* to adjust the amount of back pay awarded to Pagán. Plaintiff consented to the *remittitur* and a Judgment was issued for the amount of $47,145.65. (Add. 4-5). Walgreens argued against the imposition of liquidated damages inasmuch as it acted at all times in good faith and with reasonable grounds to believe that its acts were not in violation

of FMLA. As a result, the Court denied Pagán's request for the imposition of liquidated damages against Walgreens. (Add. 4-5).

After trial, Pagán filed a Motion to Alter Judgment under Rule 59(e) requesting the imposition of pre-judgment interests to the back pay award. (App. 54-58). Walgreens filed a Motion under Rule 50 and Rule 59, and a Motion to Alter Judgment under Rule 59(e) requesting that the Court eliminate overtime hours from the back pay calculation. (App. 59-102).

The Court denied Walgreens' renewed Motion under Rules 50 and 59 and the Motion to Alter Judgment, and granted Pagán's Motion to Alter Judgment. As a result, an Amended Judgment was entered for $47,145.65 plus pre-judgment interests. (Add. 6-14). Walgreens filed a Motion to Reconsider the Court's denial of its Motion to Alter Judgment, but the Court denied the same. (App. 103-109). On December 27, 2010, Walgreens filed a Notice of Appeal. (App. 110-111).

### IV. STATEMENT OF FACTS

The following undisputed facts unfurled before the Jury and the Judge:

**A.    Pagán's Hospitalization, May 10-May 17, 2008**

Pagán was one of the Assistant Managers at the Walgreens store in Juana Díaz. (App. 129). On May 10, 2008, during Pagán's 4am to 2pm work shift, he began feeling chest pain and decided to go to the emergency room at Damas Hospital during his 9am break. (App.

130-131). Pagán's wife, Ada Renta (hereinafter, "Renta"), arrived at the ER and Pagán asked her to call Walgreens. (App. 131). Renta called the store and informed Edwin Figueroa, the Store Manager and Pagán's supervisor (hereinafter, "Figueroa"), that Pagán was in the ER and that as soon as she had more information, she would contact him again. (App. 120-122, 168-171). Renta claims she called the store two more times that day and spoke to two different employees-Giovanni Rivera and Carlos Figueroa- to notify about Pagán's admission to the hospital. (App. 122-125). Neither of these two employees notified Figueroa about Renta's call and Renta herself did not contact Figueroa again on May 10 nor any time later, as agreed, to inform about Pagán's status. (App. 126-127, 172-174).

**B.  After Pagán's Hospital Release, May 17-May 23**

Pagán was released from the hospital on May 17, 2008.  Upon his release, he went to the Walgreens store where he worked to pick up prescription medicines.  There, he was greeted by his fellow co-workers, including the Assistant Manager on duty, Mariel Colón (hereinafter, "Colón") and Wanda Santiago (hereinafter, "Santiago"). (App. 132-135).  Figueroa was not in the store that day because, as Pagán himself admits, Colón was the highest ranking officer at the store on May 17. (App. 133-134).  Pagán alleges that upon his visit to the store that day, he submitted a medical certificate from Damas Hospital and informed about his upcoming week-long absence pursuant to his doctor's orders. (App. 134-136).  It is undisputed

that Figueroa was not informed by anyone that Pagán went to the store that day- let alone that he submitted a medical certificate, nor that he would be absent an additional week pursuant to medical orders. (App. 172-174).

By May 19, Figueroa had not heard from Pagán since he received the phone call from his wife on May 10. Although Figueroa understood that the adequate course of action to be followed at the time was immediate termination due to job abandonment, given that nine (9) days had elapsed without Figueroa receiving any communication from Pagán, Figueroa consulted with his supervisor, District Manager Ada Colón (hereinafter, "DM Colón") and the Company's legal counsel, Frank Bear (hereinafter, "Atty. Bear"). They decided to give Pagán an opportunity to explain his unreported absences. Thus, Figueroa sent a letter to Pagán warning him that failure to contact management could amount to separation from employment due to job abandonment, and advised him about leaves that could be applicable due to his absences. (Add. 40; App. 172-177, 237-240, 252-254).

Figueroa found out for the first time, and after he had sent the letter on May 19, that Pagán had been hospitalized from May 10 to May 17, when the medical certificate from Damas Hospital mysteriously appeared taped to Figueroa's office door. (App. 179-183). Upon learning about this, Figueroa called DM Colón and Atty. Bear to discuss what was the adequate course of action to follow.

They decided that, even though now there was an excuse for Pagán's absences from May 10 to May 17, Pagán still had not reported to work for a whole week after his release, had not provided a medical excuse nor had called to inform about any absences after his release from the hospital. Therefore, they understood that Pagán had abandoned his job. (App. 178-179, 240-241, 255-256).

On May 23, Pagán went to the store and notified Assistant Manager Ivelisse López about his availability to begin working the next day. Since Pagán was not on schedule to work the following day, and Figueroa was not in the store at the time, López agreed to call Pagán once she found out his schedule. López called Ernie Ortiz (Executive Assistant Manager), who called Figueroa to inform that Pagán had stopped by the store and wanted to know his work schedule. This was the first time Figueroa heard from Pagán since he left the store on May 10. Pursuant to Figueroa's instructions, López called Pagán later that day and informed him that he had to meet Figueroa the next day at 8:00am. (App. 137, 184-186).

## C. Pagán's Termination on May 24 and the DOL

On May 24, when Pagán arrived to the store, he clocked in and started to work. When Figueroa arrived at the store, he was surprised to see Pagán working because his instructions were to meet with him, not to work a certain shift. At that moment, Figueroa informed Pagán that he did not work at Walgreens and asked him to return the store keys. (App. 137-138, 187-192). After Pagán

7

was informed about his termination, he went to the Department of Labor (hereinafter, "DOL") to request unemployment benefits. (App. 113-114).

**D.    The Company's Reconsideration of the May 24 Termination**

Figueroa told Pagán on May 24 that if he wanted further information regarding his termination, he had to contact Miriam Díaz from Human Resources. Unsatisfied with his termination, Pagán went to Walgreens' central offices a few days later and met with Miriam Díaz from Human Resources to explain the situation that led to his absences and submitted his medical certificates. Díaz informed Pagán that she would speak with the Company's attorneys and call him back. (App. 138-139, 242-244, 256).

Miriam Díaz discussed Pagán's side of the story with Figueroa, DM Colón, and Atty. Bear.  They decided to reconsider the decision to terminate Pagán, and provide him the opportunity to explain his unreported absences.  Pagán was called to be interviewed at the store on June 4, 2008. (App. 116-117, 193-196, 243-244, 256-258).

**E.    The DOL's Investigation (Part I): June 4, 2008**

An investigator from the DOL, Edna Reyes (hereinafter, "Reyes") communicated with Walgreens' representative- Atty. Frank Bear- to investigate the facts that led to Pagán's termination. (App. 115, 258). As the contemporaneous records from the DOL reflect, on June 4, 2008 at 8:35am, Atty. Bear informed Reyes that even though Pagán had been terminated for job abandonment, the Company had

8

reconsidered its decision, and was willing to give Pagán an opportunity to explain the situation; if justified, Pagán would be reinstated. (Add. 31-33; App. 116-119, 258). Atty. Bear also informed Reyes that the Company had decided to summon Pagán for an interview that day because they wanted to give him a chance to explain his unreported absences. At the time Atty. Bear had this conversation with Reyes, the Company's internal investigation had not been conducted. (Add. 31-33; App. 258).

**F.  The June 4 Investigation that Led to Pagán's Termination**

On June 4, 2008 Pagán met with Figueroa and Loss Prevention Manager, Melvin Rodríguez, who was acting as witness, at the Walgreens store in Juana Díaz. (App. 195-199, 256-258). In this meeting, Pagán informed the following: (1) that his wife had spoken to Giovanni Rivera about his hospitalization on May 10, and (2) that on May 17 he provided a medical certificate to **Mariel Colón** at the personnel office in the presence of employee Wanda Santiago. (Add. 18-19, 41; App. 200-206, 256-258). Figueroa was surprised to hear this because he had not been provided this information before. At that point, Figueroa thought that they had committed a mistake by terminating Pagán due to job abandonment because, if Pagán's story was true, he had effectively notified two of the stores' Assistant Managers- Colón and Rivera- about his hospitalization and about his week-long absence after the hospitalization. (App. 202-203, 263-264). Pagán submitted a written statement detailing the

testimony he had rendered during that interview. (Add. 16-17, 41;
App. 202, 209).  At the end of the meeting, Pagán was informed that
an investigation would be conducted with the store employees he
mentioned, and he would be informed about the outcome of the same.
(App. 203-204).

Once Pagán left the interview, he called Giovanni Rivera and
informed him that he (Rivera) would be called for an interview.
During this call, Pagán asked Rivera to remember that his wife had
called him to inform about his hospitalization. Rivera responded to
Pagán that he had never received a phone call from his wife, and
that he did not even know her. (App. 207-208, 234-235).

Later that day, Giovanni Rivera was interviewed by Figueroa
and Rodríguez.  Giovanni Rivera denied receiving a call from Pagán's
wife on May 10 to inform about Pagán's hospitalization and informed
the investigators about the phone conversation he had earlier that
day with Pagán. Giovanni Rivera submitted a written statement
reflecting the testimony he provided at this meeting. (Add. 20-21,
42; App. 207-209, 232-235).

That day, Figueroa and Rodríguez also interviewed Assistant
Manager Mariel Colón, who blatantly denied receiving a medical
certificate from Pagán nor being informed by Pagán that he would be
absent one week after his release from the hospital. (Add. 21-23;
App. 210-213, 227-229). Colón submitted a written statement
reflecting the testimony she provided at this meeting. (Add. 43,

App. 213-214, 225-227). As part of the investigation, Figueroa reviewed the store's surveillance video from May 17, and it served to confirm that Pagán did not submit a document to Colón, as he had stated during the investigation. (App. 217-219). Finally, Rodríguez called Wanda Santiago (who was out of Puerto Rico on personal leave at the time), and she confirmed Mariel Colón's testimony. (App. 214-216). In sum, the investigation revealed that Pagán had lied about notifying his hospitalization to Giovanni Rivera through his wife and had lied about his submission of a medical certificate to Mariel Colón.

After Figueroa discussed the outcome of the investigation with DM Colón and Atty. Bear, they decided to terminate Pagán for his dishonest conduct, especially considering that the Employee Manual states that dishonest conduct is cause for immediate termination. (Add. 35-39; App. 220-223, 245-251, 258-262). No consideration whatsoever was given to the fact that Pagán had been hospitalized earlier. (App. 223-224). On June 6, 2008, Pagán was notified that he was terminated because the investigation conducted reflected that he had engaged in dishonest conduct. (Add. 23, 27-28).

**G. DOL Investigation (Part II): June 6, 2008**

On June 6, 2008, Atty. Bear called the DOL investigator, Edna Reyes, to inform her about the outcome of the Company's investigation. Atty. Bear informed Reyes that Pagán had been terminated because he had lied during the investigation about the

notification of his absences.  (Add. 31-33; App. 117-119, 262-264).
Atty. Bear told the investigator that before they learned about
Pagán's dishonest conduct on June 6, the Company had reconsidered
the termination and was willing to give him a written warning.
(Add. 24-26, 32-34; App. 118).  Since Pagán engaged in dishonest
conduct, the Company had no other alternative but to terminate this
Company asset entrusted Manager. (App. 223-224, 230, 262-264).

### V. SUMMARY OF THE ARGUMENT

Walgreens requests *de novo* review in determining the court's
denial of its motion for judgment as a matter of law.  Even under
an abuse of discretion standard, the court erred in denying a new
trial inasmuch as the verdict was against the clear weight of the
evidence.

The evidence is insufficient to establish a causal connection
under FMLA between Pagán's absences and his termination because the
evidence demonstrated that Pagán made inaccurate representations to
the Company regarding his notification of absences and, based on
this belief, the Company terminated Pagán due to dishonest conduct.
 Moreover, the evidence is insufficient to establish that Walgreens'
decision to terminate Pagán was false and that retaliation was the
true motive for his termination.  Finally, Walgreens requests *de
novo* review of the order denying its Motion to Alter Judgment
inasmuch as overtime compensation should not have been included in
the back pay award or, in the alternative, the amount used should

have been based on the parties' stipulation.

### VI. ARGUMENT

**A.    Standards of Review**

**1.    Sufficiency of the Evidence (Rule 50): *De Novo***

The District Court's decision to grant or deny a Rule 50 motion for judgment as a matter of law is reviewed by the Court of Appeals *de novo*. See Monteagudo v. AEELA, 554 F.3d 164, 170 (1st Cir. 2009). The appellate court will view the evidence in the light most favorable to the verdict, asking only whether a rational jury could on the basis of that evidence find as the jury has. See Marcoux v. Shell Oil Products, 524 F. 3d 33, 40 (1st Cir. 2008).

**2.    New Trial (Rule 59): Abuse of Discretion**

The denial of a motion for a new trial is reviewed for "a manifest abuse of discretion." Marcoux, 524 F. 3d at 40 (citing United States v. George, 448 F.3d 96, 101 (1st Cir.2006)). The Court of Appeals "will order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice." Id. (citing Whitfield v. Meléndez-Rivera, 431 F.3d 1, 9 (1st Cir.2005).

**3.    Back Pay Award (Rule 59(e)): *De Novo***

Ordinarily, the District Court's denial of a Rule 59 (e) motion to alter judgment is typically reviewed for abuse of discretion. See Rio Mar Associates, LP, SE v. UHS of Puerto Rico, Inc., 522 F.3d 159, 163 (2008) (citing Vasapolli v. Rostoff, 39 F.3d 27, 36

(1st Cir.1994)).  However, when the disposition of a Rule 59 (e) motion depends entirely on a question of law, the review is under the *de novo* standard.  <u>See</u> <u>Rio Mar</u>, 522 F.3d at 163 (citing <u>Pérez v. Volvo Car Corp.</u>, 247 F.3d 303, 319 (1st Cir.2001); <u>Charlesbank Equity Fund II v. Blinds to Go, Inc.</u>, 370 F.3d 151, 158 (1st Cir. 2004).  Moreover, it has been determined that "review of the legal principles used by the district court in determining the availability of back pay is *de novo*." <u>Johnson v. Spencer Press of Maine, Inc.</u>, 364 F.3d 368 (1st Cir. 2004).

**B.   Insufficient Evidence to Establish Causal Connection Between Termination and Alleged Retaliation Under FMLA**

For purposes of this appeal, Walgreens will deem that Pagán provided adequate notice of his need for FMLA leave.  Now, even viewing all facts in favor of Pagán, the final element of the *prima facie* case- that there is a causal connection between the protected conduct and the termination- is not met.  To establish a *prima facie* case of FMLA retaliation, the employee must demonstrate that FMLA leave was the **determinative factor** in the employment decision at issue.  <u>See</u> <u>Hatchett v. Philander Smith College</u>, 251 F. 3rd 670, 677 (8th Cir. 2001)(citing <u>Beal v. Rubbermaid Commercial Products, Inc.</u>, 972 F. Supp. 1216, 1229 (S.D.Iowa 1997)).

In this case, Pagán failed to demonstrate that his FMLA absences were the determinative factor in the decision to terminate him.  The uncontested testimony of the decision makers- Store Manager Edwin Figueroa, DM Colón and Atty. Frank Bear- demonstrate

14

that the **determinative factor** for the decision to not reinstate Pagán and terminate him on June 6 was his dishonest conduct. (App. 223-224, 238-251, 252-264).

Walgreens contends there is no causal connection between Pagán's termination on June 6 and his absences between May 10 and May 23. The determinative factor for Pagán's termination was his dishonesty. Plaintiff himself admitted during trial that he provided false information to the Company on June 4 when he was interviewed by Figueroa. This fact is uncontested because Pagán admitted so at trial:

```
Q.    So the representation that you were making to Walgreens, to
      Edwin Figueroa, and to Melvin Rodriguez, was that you had
      submitted that directly to her [Mariel Colón]. Isn't that
      correct?
A.    That's correct.
[...]
Q.    And this statement was obviously made much closer to the event
      that you're writing than we are today, isn't that correct?
A.    That's correct.
[....]
Q.    And the reason you submitted that statement was so that they
      could verify and investigate, as they stated to you. Is that
      correct?
A.    That's correct.
Q.    And among the things that they were going to investigate was
      precisely whether you had given Mariel Colon the Statement, as
      you indicated there, is that correct?
A.    Yes.
Q.    You're aware that there's a video, correct?
A.    Yes.
Q.    [...]You had stated under oath to me that you handed Mariel
      Colon in her hand that medical certificate in the office.
A.    That's correct.
Q.    And when you saw the video, you realized that that's not true,
      correct?
A.    That's correct.
Q.    And that's why you testified here that that was not correct.
A.    Correct. After I saw the video.
```

15

**Q.  But the fact of the matter is that on the date that you were dismissed from Walgreens on the 6th, the information that Walgreens had was that you had given the statement to Mariel Colon, correct?**

**A.  That's correct.**

(Add. 16-17, 41).

Pagán admitted that he incorrectly informed the investigators that he had submitted the certificate- hand to hand- to Mariel Colón, but the truth was that he had handed the same to another employee, Wanda Santiago.  When Walgreens verified Pagán's version with Mariel Colón, she directly controverted Pagán's allegation. (Add. 43; App. 227-229).

Pagán offered absolutely no evidence that his absences from May 10 to May 23 were taken into account in the Company's decision to terminate him on June 6 for dishonest conduct.  Pagán's false testimony provided when asked about his efforts to notify his absences- or at the very least, the Company's legitimate and good faith belief that Pagán was lying- was the determinative factor for his termination.  Pagán failed to present sufficient evidence to establish by a preponderance of the evidence that there was a causal connection between his absences and his termination for dishonesty because FMLA leave was not the **determinative factor** in the employment decision at issue.

**C.  Legitimate, Non-Discriminatory Reason for Termination Established**

Pagán claims that his termination violated FMLA because it was prompted by his FMLA protected absences.  It has been determined

16

that in such cases,

> "...the employer's motive is relevant, and the issue is whether
> the employer took the adverse action because of a prohibited
> reason or for a legitimate nondiscriminatory reason. Such
> issues are analogous to those raised in cases involving other
> types of discrimination, such as Title VII[...]. In such
> cases, courts have created a framework for analyzing the
> tricky issue of motivation. McDonnell Douglas Corp. v. Green,
> 411 U.S. 792 (1973) (citations omitted). When there is no
> direct evidence of discrimination, the McDonnell Douglas
> burden-shifting framework applies to claims that an employee
> was discriminated against for availing himself of
> FMLA-protected rights." Hodgens v. General Dynamics Corp., 144
> F.3d 151, 160 (1st Cir.1998).

If a plaintiff can establish a *prima facie* case of
retaliation- a burden that Walgreens posits Pagán failed to
satisfy- the burden shifts to the employer "to articulate a
legitimate, non-discriminatory reason for its employment decision."
Mesnick v. General Electric Co., 950 F.2d 816, 827 (1st Cir. 1991).
In this case, even if the Court deems that through the evidence
presented at trial Pagán met his *prima facie* case of retaliation or
discrimination under FMLA, he still failed to comply with the
McDonnell-Douglas burden shifting framework since Walgreens
articulated a legitimate, non-discriminatory reason for the adverse
employment action.

Under the McDonnell-Douglas framework, in order to rebut the
presumption that arises upon the establishment of a *prima facie*
case of retaliation under FMLA, the employer need only produce
enough competent evidence which, if taken as true, would permit a
rational fact finder to conclude that the challenged employment

17

action was taken for a legitimate, nondiscriminatory reason. Hodgens, 144 F.3d at 166-167. Even if an employee is able to prove a *prima facie* case of retaliation under FMLA, the employer's proffered reason for termination- such as the employee's dishonest conduct- is a legitimate non-discriminatory reason for termination, rebutting the *prima facie* case. Jennings v. Mid-American Energy Co., 282 F. Supp. 2nd 954 (S.D. Iowa 2003). This is precisely what Walgreens did at trial- it presented uncontested evidence about false information presented by Pagán during an investigation as its basis for termination- and in doing so, laid out the legitimate, nondiscriminatory motive for Pagán's termination on June 6, 2008.

An employer articulates a legitimate non-discriminatory reason for termination where it has an honest, ***good faith belief*** for termination, even if it turns out that the employer was mistaken in that belief. Here, Walgreens accomplished this by offering the testimony of the decision-maker- Figueroa- as well as the two individuals who guided him through this process- DM Colón and Atty. Frank Bear- that Walgreens discharged Pagán because of what they truly believed was the dishonest conduct he exhibited during the investigation process in June of 2008. This investigation was a good faith attempt geared towards the reconsideration of their prior decision to terminate Pagán, however, the testimony of 3 employees contradicted Pagán's testimony and this served as the basis for the conclusion that he was being dishonest. But, what

better evidence than Pagán's own trial testimony, to conclude that the Company genuinely thought Pagán was being dishonest? Pagán admitted at trial that he represented to the investigators that he had submitted a medical certificate to **Mariel Colón**, and it turned out that this information was false.  As he stated at trial, but not at the time, it was not through Mariel Colón, but through Wanda Santiago, that he allegedly excused himself. (Add. 16-17). Figueroa and Rodríguez lacked this piece of information, therefore, when they were investigating, they parted from the (later shown to be incorrect) premise that Pagán had submitted the medical certificate to Mariel Colón, who confirmed she had not received such certificate.

Moreover, the evidence showed that Figueroa's intention evidently was not to retaliate or discriminate against Pagán for being eligible for FMLA leave, but quite to the contrary.  Figueroa sent a letter to Pagán on May 19 to inform him that he could be eligible to certain leaves, but he had to contact management.  Far from demonstrating discriminatory animus, this letter demonstrates the non-retaliatory nature of the decision to terminate Pagán because the Company was fully aware of the rights Pagán potentially enjoyed.  Furthermore, the DOL record reflects that at first Walgreens' counsel informed the agency that the Company was willing to reinstate Pagán. Again, far from demonstrating a discriminatory animus, Atty. Bear's contemporaneous testimony from June 4th (when

the dishonest conduct had still not taken place), reflects a good faith attempt to keep Pagán employed.  During the second contact with the DOL, Atty. Bear informed that Pagán's subsequent dishonest conduct was, as it was, what led to his termination.

It has been clearly established that "[w]here an employee properly takes FMLA leave, the employee cannot be discharged for exercising a right provided by the statute, but can still be discharged for independent reasons." See Nagle v. Acton-Boxborough Regional School Dist., 576 F.3d 1, 3 (1st Cir. 2009).  It is true that if an employee is fired for taking FMLA-protected leave, relief is available.  There is no protection, however, for an employee who is fired for appropriate cause but also happens to be on leave." (internal citations omitted). See Fantini v. Salem State College, 557 F.3d 22, 35 (1st Cir. 2009), citing 29 C.F.R. § 825.216.  In the case at bar, the ultimate reason for Pagán's termination- his dishonest conduct- was independent from Pagán's FMLA protected absences.

In Smith v. Hope School, 560 F. 3d 694 (7th Cir. 2009), the Court determined that the termination of an employee because of her unexcused absences from work was not retaliation under FMLA, even if she believed she was on FMLA leave during her absences, where she submitted fraudulent paperwork in support of her request for leave, and request thus was invalid.  Thus, even when an employee requests and can demonstrate an entitlement to FMLA leave, she has

no greater rights than the employee who continues to report to work.  Therefore, an employee may be terminated, even where the termination interferes with his ability to take FMLA leave, so long as she would have been terminated regardless of the leave request.  See Satterlee v. Allen Press, Inc., 455 F. Supp. 2nd 1236 (D. Kan. 2006); Moss v. Bluecross, Blue Shield of Kansas, Inc., 534 F. Supp. 2nd 1190 (D. Kan. 2008); Vanmeveren v. Whirlpool, 2003 WL 21235475. If an employer would be justified in terminating an employee for reasons unrelated to taking leave, FMLA does not shield the employee from termination while on leave and the employee has no right of restoration under FMLA. See Anderson v. New Orleans Jazz & Heritage Festival and Foundation, Inc., 464 F. Supp. 2nd 562 (E.D. La. 2006).  Most importantly, and precisely on point, FMLA does not shield an employee from termination for dishonesty or violation of a company policy regarding dishonesty simply because the alleged misconduct concerns use of FMLA leave.  See Dowles v. Conagra, Inc., 980 So. 2nd 180 (2nd Cir. 2008). Pagán's FMLA protected absences do not shield him from the consequences of engaging in dishonesty, as established by Company policy.

The evidence showed that Pagán was terminated on June 6- after reconsidering the May 24 termination- not in violation of the Act, but rather for his dishonest conduct regarding his notification of absences.  Walgreens articulated a legitimate non-discriminatory reason for Pagán's termination and it established it had an honest,

***good faith*** belief that Pagán had engaged in dishonest conduct, even if it turns out that it was mistaken in that belief. Pagán's false testimony when asked about his efforts to notify his absences- or at the very least, the Company's legitimate and good faith belief that Pagán was lying- was the ultimate independent reason for his termination. The fact that there can be a factual controversy over whether Pagán lied or not during the investigation does not preclude the entry of a judgment in favor of Walgreens because, regardless of whether Figueroa was correct in his appreciation of who was telling the truth (Pagán or his co-workers), the important matter is that in the decision maker's mind, the right to FMLA benefits was not one of the factors considered for Pagán's termination. The Company's basis for Pagán's dismissal was legitimate, non-discriminatory and warranted his termination. See Morgan v. Hilti, Inc., 108 F.3d 1319 (10th Cir. 1997). Walgreens produced concrete and uncontested evidence that demonstrated the decision maker's train of thought throughout the sequence of events, and his non-discriminatory and non retaliatory motive with regards to Pagán's termination.

The reasons brought forth by Walgreens in justification for terminating Pagán are logical, plausible, non-pretextual and non-discriminatory on their face and, given that the relevant question that had to be assessed by the Jury was whether the reason for terminating Pagán was discriminatory, and not whether it was a

22

wise or warranted decision, Walgreens satisfied its burden of bringing forth valid reasons for Pagán's termination.

## D.    **Insufficient Evidence to Infer Retaliatory Animus or Pretext**

Pagán bore the burden to show that Walgreens' proffered reason for his termination was pretextual.  Walgreens posits that Pagán failed to meet this burden.  Pagán's only assertion to the effect that his termination was pretextual is his belief that the Company fabricated a "sham" investigation and that the June 4 employee interviews was nothing but a "staging" to find another reason for Pagán's termination.  The evidence presented in support of this theory is none.  The record is devoid of any evidence whatsoever that would support this theory, other than mere conjecture and speculation.  But quite to the contrary, the record shows contemporaneous evidence that serves to entirely discredit Pagán's theory.  To this effect, the DOL file reflected the Company counsel's testimony on the morning of June 4th informing that the Company was considering the possibility of reinstating Pagán, and that an investigation would be conducted to award Pagán an opportunity to explain his absences.  Atty. Bear's testimony to the DOL in the morning of June 6 (which was reiterated at trial) corroborated that the Company decided to terminate Pagán because during the investigation Assistant Manager Pagán (regularly and exclusively entrusted with store assets) engaged in independent conduct that warranted his termination, that is, <u>dishonesty</u>.  It is

Walgreens' position that the uncontroverted evidence presented at trial was insufficient for the Jury to infer retaliatory animus or pretext and that Walgreens proved that it had a legitimate, non-discriminatory reason for the termination wholly unrelated to Pagán's protected activity.

FMLA requires specific motivation- the motive of the employer to discriminate against the employee because of the exercise of rights under FMLA. When the employer has an independent basis for the termination, as here, the motive is expunged and does not come into play. Consequently, Walgreens should not be held accountable for a retaliatory act that did not take place, and judgment as a matter of law should have been entered by the District Court dismissing Pagán's retaliation claim under FMLA.

Perhaps the best indication that the Jury was unreasonable in its determination that Walgreens retaliated against Pagán in violation of the FMLA is the District Court's own ruling regarding liquidated damages. The Jury was instructed that an employer articulates a legitimate non-discriminatory reason for termination where it has an honest, ***good faith belief*** for termination, even if it turned out that the employer was mistaken in that belief. (Add. 44). The Court found that Pagán was not entitled to liquidated damages because Walgreens acted at all times in ***good faith***. (Add. 4-5). A good faith finding from the Court therefore precludes a finding from the Jury that Walgreens is liable under FMLA. But

24

perhaps most importantly, it was demonstrated- by Pagán's own admission- that Walgreens was mistaken (at least partly) in its belief that Pagán had lied during the investigation about his submission of a medical certificate, because Pagán himself <u>admitted</u> at trial that he provided **inaccurate** information during the investigation process (specifically, that he submitted his medical certificate- hand to hand- to Mariel Colón when he had not done so). Walgreens posits that no reasonable Jury could have found as it did, and consistent with the District Court's determination that Walgreens acted in good faith, the verdict against Walgreens is unwarranted.

## E.    Calculation of Back Pay under FMLA

The Court granted Pagán $47,145.65 in back pay, including $20,637.50 in overtime (hereinafter, "OT"). (Add. 4). In determining this amount, the Court calculated the amount of pay Pagán would have earned had he remained employed with Walgreens from his termination until the time of trial, that is, 125 weeks. Since Pagán's salary at the date of termination was $12.70 per hour, his weekly wage was $508 per week. Consequently, the Court correctly concluded that Pagán's salary for the 125 weeks from his termination until the time of trial was $63,500.00. From this amount, the Court subtracted the amount Pagán had mitigated in his new employment at Play 'N Trade, which the parties agreed was $38,515.35. Then, the Court added the amount Pagán was entitled to

25

during the 125 week period in Profit Sharing at the rate of $12.19 per week, for a total of $1,523.50. Up until this point in the calculation, the total amount that Pagán would be entitled to for back pay under FMLA, is **$26,508.15**. This is the amount that Walgreens understands Pagán would be entitled to under FMLA, if he prevails in his claim.

Notwithstanding, the Court added the amount of $20,637.50 based on the speculation that Pagán would have worked a total of 6.5 OT hours per week at double the amount of his hourly salary ($25.40), had he remained in his employment from the time of his termination until the day the verdict was rendered. Walgreens contends that this amount should have been excluded from the calculation because lost compensation does not include estimated OT compensation and only regular hours should have been taken into account. See Thorson v. Gemini, Inc., 205 F. 3d 370 (8th Cir. 2000). In Thorson, the Court of Appeals for the Eighth Circuit held that an award of back pay did not include claimed overtime wages. The plaintiff in that case brought an action against her former employer claiming that her termination for excessive absenteeism violated FMLA. Following jury trial, the Court awarded Thorson damages. Thorson appealed and contended that the court erred because it did not include in the back pay award any amount for lost OT wages. Thorson had worked an average of 65 hours of OT during each of the previous two years, and argued that the court

should have included 65 hours per year in the award of back pay. In response to Thorson's argument, the court held: "[w]e see no error in the court's failure to award an amount for overtime back pay that would be little more than guesswork." Thorson, 205 F. 3d at 384. The court in Thorson rejected the plaintiff's contention that she would have worked OT had she remained employed during the years between her dismissal and the trial on damages, as purely speculative. See also, Buckman, Deborah, Award of Damages Under Family and Medical Leave Act, 176 ALR Fed 591 (2002).  As in Thorson, in the case at bar Pagán prevailed in his FMLA claim and the Court granted his request that compensation under FMLA include OT pay.  Walgreens posits that the District Court should have followed the ruling in Thorson and, in doing so, excluded from the award of back pay the amount of OT hours that Pagán would have worked had he remained employed at Walgreens because doing so would be purely speculative.

If, however, this Honorable Court decides that the District Court was correct in refusing to follow the holding in Thorson, Walgreens contends that the lower Court erred in its back pay award inasmuch as it failed to use as a basis for this calculation the amount of OT hours that the **parties stipulated** that Pagán worked the year before his termination. The parties' Stipulation #5 stated that during the 12-month period immediately before May 10, 2008, Pagán worked a total of 2,263.20 hours. (Add. 45).  Based on the

27

fact that an employee's regular work week is comprised of 40 regular hours, and that a calendar year has 52 weeks, the amount of regular hours worked by Pagán the year before his termination was 2,080 hours.  When subtracting the amount of regular hours worked (2,080) from the total amount that the parties stipulated that Pagán worked the year before his termination (2,263.20), it can be concluded that Pagán worked a total amount of 183.20 OT hours (3.52 OT hours per week) at a rate of $25.40.  Therefore, the amount that Pagán earned in OT work the year before his termination was $4,653.28[1]. Consequently, for the 125 weeks following Pagán's termination, the amount of OT pay should have been $11,185.77 ($89.49 weekly x 125 weeks).

Instead, the District Court concluded that Pagán would have worked 6.5 OT hours/week for 125 weeks taking into consideration two pay stubs: (1) a direct deposit for the period between May 10 and May 16, 2008 corresponding to 44 hours, and (2) a cash salary payment for 46.5 hours during the period ending May 23, 2008. (Add. 29-30, 34).  The Court did not consider that the parties had stipulated that during the 12-month period immediately before his termination, Pagán worked a total of 2,263.20 hours, that is, a total of 183.20 OT hours a year, which translates into **3.52** of OT hours/week.  Walgreens contends that since the amount of OT hours

---

1 183.20 OT hours/year x $25.40 (double hourly rate)=
$4,653.28/year; $4,653.28 /52 weeks = $89.49/ week

Pagán would have worked is purely speculative, as evidenced by these 2 different pay stubs, the District Court should have used the amount of hours that the parties had stipulated that Pagán worked during the 12-month period immediately before his termination to make its calculation.

If this Honorable Court rejects the <u>Thorson</u> ruling and decides that OT pay should have been included in the back pay award, the amount stipulated by the parties as the amount of hours worked by Pagán the year immediately before his termination should be the basis to estimate the amount of overtime hours Pagán would have worked during the 125 weeks after his termination. Thus, the amount to be awarded to Pagán for back pay including OT, but taking into account the parties' stipulation, would be $37,693.91 ($26,508.15 + $11,185.77).

### VII. CONCLUSION

Walgreens respectfully requests that the Court, as a matter of law, enter judgment in its favor regarding Pagán's FMLA claim and/or grant a new trial regarding this claim. Alternatively, Walgreens requests the exclusion of overtime pay from the back pay award or reduce it based on the amount of overtime hours the parties stipulated that Pagán worked the year before his termination.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 19th day of April, 2011.

**WE HEREBY CERTIFY** that on this same date we electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to Plaintiffs' counsel, Alfredo Acevedo Cruz (lcdoacevedo@yahoo.com) and Jorge Martínez (squalus@rocketmail.com), by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**USERA, FIGUEROA & GINER, P.S.C.**
Attorneys for Defendant-
Appellant/Cross-Appellee
PO Box 13399
San Juan, Puerto Rico 00908
Telephone: (787) 725-8080
Telefax: (787) 723-8763


***s/Gregory T. Usera***
First Circuit Bar No. 82810


***s/Natalia Villavicencio***
First Circuit Bar No. 109087

## INDEX OF ADDENDUM

Verdict Form
entered on October 25, 2010, Docket 160......................1-2

Judgment
entered on October 25, 2010, Docket 167.......................3

Amended Minutes of Proceedings and Order
entered on October 26, 2010, Docket 169....................4-5

Order Denying Motion for Judgment as a Matter of Law
entered on November 8, 2010, Docket 177.......................6

Order Denying Motion to Alter Judgment
entered on December 7, 2010, Dockets 186 & 187 .............7-13

Amended Judgment
entered on December 7, 2010, Docket 188......................14

Portions of Trial Hearing (October 19, 2010)
entered on February 28, 2011, Docket 211...................15-28

Plaintiff's Trial Exhibits
      Exhibit 3, Time Card Period Ending 5/16/08.............29-30
      Exhibit 5, Excerpts DOL File..........................31-33
      Exhibit 6, Cash Salary Payment Period Ending 5/23/08......34

Defendant's Trial Exhibits
      Exhibit A, Excerpts Walgreens Manual and Receipt.......35-39
      Exhibit D, Letter from E. Figueroa, 5/19/08..............40
      Exhibit F, Statement from J. Pagán, 6/4/08...............41
      Exhibit H, Statement from G. Rivera, 6/4/08..............42
      Exhibit I, Statement from M. Colón, 6/4/08...............43

Jury Instruction #19
entered on October 21, 2010, Docket 155......................44

Stipulated Fact # 5
entered on October 24, 2010, Docket 157 .....................45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO



JUAN C. PAGAN-COLON, et al.,

Plaintiffs,

v.

WALGREENS DE PUERTO RICO, INC.,

Defendants.

VERDICT FORM

CIVIL NO. 08-2398 (GAG)

---

I. Retaliation Claim under the Family Medical Leave Act

1.    Has plaintiff proven, by a preponderance of the evidence, that he was terminated from
his employment because of his being on medical leave? To answer yes, you must find both
that plaintiff has proven by a preponderance of the evidence that (i) there is a causal
connection between his being on medical leave and his discharge and (ii) that Walgreen's
proffered reason for the discharge was not legitimate and non-discriminatory.

 Yes

_____ No

If you have answered "Yes," proceed to the next question. If you have answered "No" to the
previous question, sign and date the form.

2.    State the amount, if any, the plaintiff has established, by a preponderance of the evidence,
that he lost in terms of wages, and employment fringe benefits, because of defendant's
violation of the Family Medical Leave Act. You must not compensate the plaintiff for any
portion of his damages that resulted from his failure to make reasonable efforts to mitigate
his damages.

$ 100,000.⁰⁰ (one hundred thousand dollars).

This is the unanimous verdict of the jury. The same is the product exclusively of the evidence presented at trail and admitted to the Court and the application of the law as set forth in the jury charge.


October 25th, 2010
DATE


████████████████████████

FOREPERSON

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

JUAN C. PAGAN-COLON

Petitioner (s)

v.

CV. 08-2398 (GAG)

WALGREENS OF PUERTO RICO, INC.,

Respondent (s)

## JUDGMENT

Judgment is hereby entered in favor of plaintiff in the amount of $47,145.65, as remitted by the Court.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, on this 25th day of October, 2010.

FRANCES RIOS DE MORAN
CLERK OF COURT

S/ Carlos J. Rodríguez
Deputy Clerk

ADD.  3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

JUAN C. PAGAN-COLON

Plaintiff (s)

v.                                                    CV. 08-2398 (GAG)

WALGREENS OF PUERTO RICO, INC.,

Defendant (s)

### AMENDED MINUTES OF PROCEEDINGS AND ORDER

Verdict for plaintiff in the amount of $100,000.00. The Court *sua sponte* orders remittitur to the amount of $ 47,145.65.

This breakdown is as follows :

| | |
|---|---|
| 1. Salary 125 weeks ($508 per week) = | $63,500.00 |
| 2. Minus salary in Play and Trade     = | -$38,515.35 |
| 3. Profit sharing 125 weeks ($12.19 per week) = | $  1,523.50 |
| 4. Overtime pay 125 weeks (6.5 hours per week | |
|    at $25.40 per hour) = | $20,637.50 |
| | ———————— |
| Total | $47,145.65 |

The Court denied plaintiff's request for liquidated damages under Section 2617 of the FMLA. The Court however, will revisit this issue as well as that of interest via post judgment motion.

ADD.  4

The Court will address the issued of attorney's fees following the entry of judgment, as well as reinstatement / front pay matters.

SO ORDERED .

In San Juan, Puerto Rico, this 26th day of October, 2010.

S/Gustavo A. Gelpí
U.S. District Judge

**Natalia Villavicencio**

| | |
|---|---|
| **From:** | prd_docketing@prd.uscourts.gov |
| **Sent:** | Monday, November 08, 2010 11:11 AM |
| **To:** | prd_docketing@prd.uscourts.gov |
| **Subject:** | Activity in Case 3:08-cv-02398-GAG-JA Pagan-Colon et al v. Walgreens San Patricio, Inc Order on Motion for Judgment as a Matter of Law |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

### District of Puerto Rico

## Notice of Electronic Filing

The following transaction was entered on 11/8/2010 at 11:10 AM AST and filed on 11/8/2010
**Case Name:**       Pagan-Colon et al v. Walgreens San Patricio, Inc
**Case Number:**    3:08-cv-02398-GAG-JA
**Filer:**
**WARNING: CASE CLOSED on 10/25/2010**
**Document Number:** 177(No document attached)

**Docket Text:**
**ORDER denying [176] Motion for Judgment as a Matter of Law; denying [176] Motion for New Trial. The court finds that the issues raised by Defendant in its motion go to the weight of the evidence and credibility determinations. Defendant's have not raised sufficient grounds to disturb the jury's findings as to these questions of fact. Accordingly, the court denies Defendant's motion. Signed by Judge Gustavo A. Gelpi on 11/8/10. (SAA)**

**3:08-cv-02398-GAG-JA Notice has been electronically mailed to:**

Gregory T. Usera gregory.usera@um-law.com, carmen.torres@um-law.com, vanessa.munoz@um-law.com

Jorge Martinez-Luciano squalus@rocketmail.com, jorge@poapr.com, notificaciones@poapr.com

Alfredo Acevedo-Cruz lcdoacevedo@gmail.com, lcdoacevedo@ymail.com

4/6/2011

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN C. PAGAN-COLON, et al

    Plaintiffs,

       v.                         Civil No. 08-2398 (GAG)

WALGREENS OF PUERTO RICO, INC.

    Defendant.

## OPINION AND ORDER

Plaintiff Pagan-Colon filed a complaint against Defendant Walgreens de Puerto Rico, Inc. alleging retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2601, et seq. The issue was heard by a jury, which found in favor of Plaintiff. After trial, Plaintiff filed a timely motion to amend the judgment (Docket No. 170). Defendant filed its own motion to amend judgment (Docket No. 173). Plaintiff in turn filed a motion in opposition (Docket No. 178).

After reviewing the parties' submissions and pertinent law, the court **GRANTS** Plaintiff's motion to amend judgment (Docket No. 170) and **DENIES** Defendant's motion to amend judgment (Docket No. 173).

## I.    Legal Standard

There are only four recognized grounds upon which the court can grant a Rule 59(e) motion for reconsideration: (1) manifest error of law or fact upon which the court's judgment is based; (2) newly discovered or previously unavailable evidence; (3) if it is necessary to prevent manifest injustice; and (4) intervening change in controlling law. See Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n. 2 (1st Cir. 2005) (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (2d ed.1995)); see also Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2nd Cir. 1995) ("The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to a controlling decision or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion

Civil No. 08-2398 (GAG)                    2

1  reached by the court.").

2          The First Circuit has repeatedly warned movants that a motion under Fed. R. Civ. P. 59(e)

3  may not be used by the losing party "to repeat old arguments previously considered and rejected, or

4  to raise new legal theories that should have been raised earlier." National Metal Finishing Com. v.

5  BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990); see, e.g., United States v.

6  $23,000 in U.S. Currency, 356 F.3d 157, 165 n. 9 (1st Cir. 2004) ("The repetition of previous

7  arguments is not sufficient to prevail on a Rule 59(e) motion.").

8  **II.    Factual and Procedural Background**

9          Plaintiff filed a complaint against Walgreens de Puerto Rico, Inc. alleging retaliation in

10  violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. The issue was tried

11  by jury from October 18 through October 25, 2010. After deliberation, the jury returned a verdict

12  in favor of Plaintiff in the amount of $100,000. This amount was subject to remittitur and reduced

13  to $47,145.65.

14          This reduced amount was calculated based on the 125 weeks between Plaintiff's termination

15  in violation of the FMLA and the trial. Plaintiff was awarded damages for lost salary, profit sharing,

16  and overtime pay.  These damages were then reduced due to Plaintiff's mitigation of damages

17  through procurement of other employment.  Before entering judgment, the court also heard

18  arguments pertaining to the potential award of liquidated damages and Defendant's good faith

19  defense against liquidated damages. The court denied Plaintiff's request for liquidated damages, yet

20  stated that the issue of liquidated damages, as well as the issue of interest, would be revisited

21  pursuant to post-judgment motions.

22          Plaintiff filed a motion to amend judgment (Docket No. 170) on October 29, 2010.

23  Defendant filed a motion to amend judgment (Docket No. 173) on November 4, 2010. Plaintiff filed

24  a motion in opposition (Docket No. 178) on November 10, 2010.

25  **III.   Discussion**

26          Plaintiff has been awarded damages for his former employer's violation of the FMLA. The

27  parties differ as to how these damages should be calculated and have filed motions to amend

28  judgement to reflect their methods of calculation.

Civil No. 08-2398 (GAG)                    3

### A. Prejudgment Interest

1
2    In his motion to amend, Plaintiff argues that prejudgment interest is statutorily mandated

3    under the FMLA. (See Docket No. 170.) Plaintiff argues that he is entitled to prejudgment interest

4    even if the court denies liquidated damages. Plaintiff's motion has been "strictly limited" to the

5    "statutory entitlement to pre judgment interest." (See Docket No. 170.)

6    While neither this court nor the First Circuit have directly addressed this narrow issue, the

7    Fourth and Eighth Circuits have expressly stated that prejudgment interest is statutorily mandated

8    under the FMLA. See Dotson v. Pfizer, Inc., 558 F.3d 284, 302 (4th Cir. 2009) ("[P]rejudgment

9    interest on FMLA damages is mandatory rather than discretionary."); see also Hite v. Vermeer Mfg.

10   Co., 446 F.3d 858, 869 (8th Cir. 2006) ("Section 2617 indicates that the award of such interest is

11   mandatory."). The Sixth Circuit also seems to be in agreement with this interpretation. See Killian

12   v. Yorozu Automotive Tennessee, Inc., 454 F.3d 549 (6th Cir. 2006) (stating the district court failed

13   to "calculate interest on the award in favor of [plaintiff] as [is] required by 29 U.S.C. §

14   2617(a)(1)(A)(ii)"). The court agrees with the Fourth and Eighth Circuit based on the plain meaning

15   of the statute and the statute's legislative history.

16   In determining what is required by statute, the court begins by looking at its plain language.

17   "[A] statute's plain language is the primary indicator of its meaning." Mass. Fin. Services, Inc. v.

18   Sec. Investor Prot. Corp., 545 F.2d 754, 756 (1st Cir. 1976). "If the statute's language is plain, 'the

19   sole function of the courts—at least where the disposition required by the text is not absurd—is to

20   enforce it according to its terms.'" In re Rudler, 576 F.3d 37, 44 (1st Cir. 2009) (citing Lamie v.

21   United States, 540 U.S. 526, 534 (2004)).

22   Section 2617 of the United States Code provides that an employer found to be in violation

23   of section 2615 "shall be liable" for "the interest on the amount described in clause (i) calculated at

24   the prevailing rate." 29 U.S.C. § 2617. Clause (i) provides an eligible employee with damages equal

25   to any wages, salary or other compensation lost as a result of an employer's FMLA violation. See

26   29 U.S.C. § 2617(a)(1)(A). The statute also provides for an award of liquidated damages and states

27   that liquidated damages need not be awarded if an employer provides a good faith reason for the

28   FMLA violation. See 29 U.S.C. § 2617(a)(1)(A)(iii). Unlike the liquidated damages provision, the

Civil No. 08-2398 (GAG)                          4

1  interest provision does not contain any exception to an award of interest.    See 29 U.S.C.

2  § 2617(a)(1)(A). The interest provision is more similar to the provision holding employers liable

3  for an employee's lost compensation resulting from the FMLA violation.    See 29 U.S.C.

4  § 2617(a)(1)(A)(i); 29 U.S.C. § 2617(a)(1)(A)(ii).

5        In addition to the unambiguous language of the statute, the FMLA's legislative history

6  supports this interpretation. "Section 107(a)(1)(A)(ii) provides that an employer also *shall be liable*

7  *for the interest on that amount* described in clause (i), calculated at the prevailing rate." S.Rep. No.

8  103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 (emphasis added).

9        The court finds that prejudgment interest is statutorily mandated under the FMLA. Accord

10 Dotson, 558 F.3d at 302 (reversing district court ruling for failure to include interest). The judgment

11 must be amended to grant Plaintiff prejudgment interest because the denial of said interest

12 constitutes a manifest error of law. See Marie, 402 F.3d at 7 n. 2 (stating that manifest error of law

13 is grounds for granting a motion to amend judgment).

14              **B. Overtime Pay**

15       In its motion to amend, Defendant argues that overtime pay should not be included in

16 Plaintiff's damage calculations. (See Docket No. 173). In the alternative, Defendant requests that

17 the calculation of overtime hours be based on the parties' stipulated number of hours that the

18 Plaintiff worked the twelve months prior to his termination. (See Docket No. 173.) At this point

19 in time, neither this court nor the First Circuit has addressed the issue of overtime pay for FMLA

20 damages.

21       Under the FMLA, an employer's liability for damages is laid out by statute. The statute

22 provides that an employer is liable "for damages equal to (i) the amount of (I) any wages, salary,

23 employment benefits, or other compensation denied or lost to such employee by reason of the

24 violation." 29 U.S.C. § 2617.

25       In supporting its contention that overtime pay should not be awarded, Defendant relies on

26 an Eighth Circuit FMLA case, Thorson v. Gemini, Inc. 205 F.3d 370 (8th Cir. 2000). The plaintiff

27 in Thorson alleged that she worked an average of 65 hours of overtime per year and that those hours

28 should have been calculated into her damages. Id. at 384. The opinion does not provide information

Civil No. 08-2398 (GAG)                    5

1  as to how the overtime average was calculated. See id. The court refused to award the plaintiff

2  overtime pay for the four years between her termination and the trial, stating that such an award

3  would be "little more than guesswork." Id. at 384.

4       In the present case, evidence was presented at trial to show Plaintiff regularly worked forty-

5  four hours per week. Plaintiff's weekly schedule was corroborated by Defendant's payment to

6  Plaintiff of forty-four hours of sick leave for his first week absent from Walgreens. (See Docket No.

7  157 at ¶ 13.) The additional 2.5 hours per week of overtime is consistent with the fact that Plaintiff

8  worked an average number of 46.5 hours per week at Walgreens in 2008 prior to his termination.

9  (See Docket No. 164, Plaintiff's Exhibit 6.) Additionally, Plaintiff is being awarded damages for

10  the 125 weeks between his termination and the jury trial in contrast to the "four-plus years" the

11  award in Thorson would have covered.  (See Docket No. 169.); Thorson, 205 F.3d at 384.

12  Defendant does not present any newly found evidence contrary to these findings. See Fed. Deposit

13  Ins. Corp. v. World Univ., Inc., 978 F.2d 10, 16 (1st Cir. 1992), nor has it offered any legal source

14  other than Thorson to support its contention. (See Docket No. 173.) Accordingly, Defendant has

15  failed to convince the court that a manifest error of law has occurred or that judgment must be

16  altered to prevent a manifest injustice.

17       The Defendant has not presented sufficient evidence to meet the burden under Fed. R. Civ.

18  P. 59(e). See Marie, 402 F.3d at 7 n. 2. The Thorson case is not controlling on this court and no

19  binding case law or statutory interpretation has been presented to further the argument that overtime

20  should be excluded from the damages award.

21  **IV.    Conclusion**

22       The court **GRANTS** Plaintiff's motion to amend judgment (Docket No. 170). The Clerk of

23  the Court shall calculate this interest at the prevailing rate. The court **DENIES** Defendant's motion

24  to amend judgment (Docket No. 173).

25       **SO ORDERED.**

26

27

28

**Civil No. 08-2398 (GAG)**                               6

In San Juan, Puerto Rico this 7th day of December, 2010.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge

**Natalia Villavicencio**

| | |
|---|---|
| **From:** | prd_docketing@prd.uscourts.gov |
| **Sent:** | Tuesday, December 07, 2010 1:33 PM |
| **To:** | prd_docketing@prd.uscourts.gov |
| **Subject:** | Activity in Case 3:08-cv-02398-GAG-JA Pagan-Colon et al v. Walgreens San Patricio, Inc Order on Motion to Alter Judgment |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Puerto Rico

**Notice of Electronic Filing**

The following transaction was entered on 12/7/2010 at 1:33 PM AST and filed on 12/7/2010
**Case Name:**       Pagan-Colon et al v. Walgreens San Patricio, Inc
**Case Number:**    3:08-cv-02398-GAG-JA
**Filer:**
**WARNING: CASE CLOSED on 10/25/2010**
**Document Number:** 187(No document attached)

**Docket Text:**
**ORDER denying [173] Motion to Alter Judgment. See the court's Opinion and Order at Docket No. [186]. Signed by Judge Gustavo A. Gelpi on 12/7/10. (SAA)**

**3:08-cv-02398-GAG-JA Notice has been electronically mailed to:**

Gregory T. Usera gregory.usera@um-law.com, carmen.torres@um-law.com, vanessa.munoz@um-law.com

Jorge Martinez-Luciano squalus@rocketmail.com, jorge@poapr.com, notificaciones@poapr.com

Alfredo Acevedo-Cruz lcdoacevedo@gmail.com, lcdoacevedo@ymail.com

Nilda Natalia Villavicencio-Camacho natalia.villavicencio@um-law.com, carmen.torres@um-law.com

**3:08-cv-02398-GAG-JA Notice has been delivered by other means to:**

4/6/2011

ADD.    13

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

3
4    JUAN C. PAGAN-COLON, et al
5        Plaintiffs,
6              v.                              Civil No. 08-2398 (GAG)
7    WALGREENS OF PUERTO RICO, INC.
8        Defendant.
9

10                          **AMENDED JUDGMENT**

11          This judgment is hereby amended to reflect an award of prejudgment interest to Plaintiff

12    on the originally awarded amount of $47,145.65. This interest will be calculated by the Clerk of

13    the Court at the prevailing rate.

14

15    **SO ORDERED.**

16        In San Juan, Puerto Rico this 7th day of December, 2010.

17                                          *S/Gustavo A. Gelpí*

18                                          GUSTAVO A. GELPÍ

19                                          United States District Judge

20
21
22
23
24
25
26
27
28

ADD.    14

```
1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF PUERTO RICO
2

3        Juan C. Pagan-Colon,              )
                                           )
4                       Plaintiff,         )   Case No:  CV-08-2398 (GAG)
                                           )
5        vs.                               )      FURTHER JURY TRIAL
                                           )
6        Walgreens de Puerto Rico, Inc.,)
                                           )
7                       Defendant.         )

8        _____

9

10                       TRANSCRIPT OF FURTHER JURY TRIAL
                                  HELD BEFORE
11                       THE HONORABLE GUSTAVO A. GELPI
                             Tuesday, October 19, 2010

12       _____

13

14

                              A P P E A R A N C E S
15

16       For the Plaintiffs:

17            Mr. Alfredo Acevedo-Cruz
              Mr. Jorge Martinez-Luciano
18

19       For the Defendant:

20            Mr. Gregory Usera
              Ms. Natalia Villavicencio
21

22

23

24

25
                              ───── 10/19/10 ─────
```

ADD.    15

1    stated to Edwin Figueroa and Melvin Rodriguez at the

2    meeting, is that correct?

3    A.   Yes.

4    Q.   And I ask you whether the last three lines starting

5    right there (indicating) with "Saturday, 17 May," if it

6    doesn't say that you handed in a medical certificate to

7    Mrs. Mariel Colon in the presence of Mrs. Wanda Santiago.

8    A.   Yes.

9    Q.   So the representation that you were making to Walgreens,

10   to Edwin Figueroa, and to Melvin Rodriguez, was that you had

11   submitted that directly to her.  Isn't that correct?

12   A.   That's correct.

13   Q.   And you had told me under oath that you had handed that

14   to her in her hands, isn't that correct?

15   A.   That's correct.

16   Q.   And this statement was obviously made much closer to the

17   event that you're writing than we are today, isn't that

18   correct?

19   A.   That's correct.

20   Q.   When it was fresh in your mind.

21   A.   That's correct.

22   Q.   And the reason you submitted that statement was so that

23   they could verify and investigate, as they stated to you.

24   Is that correct?

25   A.   That's correct.

                        ———— 10/19/10 ————

ADD.   16

1    Q.  And among the things that they were going to investigate

2    was precisely whether you had given Mariel Colon the

3    statement, as you indicated there, is that correct?

4    A.  Yes.

5    Q.  You're aware that there's a video, correct?

6    A.  Yes.

7    Q.  Because you had stated under oath to me that -- withdraw

8    the question.

9           You had stated under oath to me that you handed

10   Mariel Colon in her hand that medical certificate in the

11   office.

12   A.  That's correct.

13   Q.  And when you saw the video, you realized that that's not

14   true, correct?

15   A.  That's correct.

16   Q.  And that's why you testified here that that was not

17   correct.

18   A.  Correct.  After I saw the video.

19   Q.  But the fact of the matter is that on the date that you

20   were dismissed from Walgreens on the 6th, the information

21   that Walgreens had was that you had given the statement to

22   Mariel Colon, correct?

23   A.  That's correct.

24   Q.  Now, in addition to that, you stated here that Giovanni

25   Rivera called you when you were in the hospital on the 15th

1    A.   Correct.

2    Q.   And dismissed because of lack of notice, correct?

3    A.   They took the key away.

4    Q.   Dismissed for lack of notice, correct?

5    A.   Correct.

6    Q.   And when we look at the text of the letter that you have

7    before you, in the beginning of the third paragraph, in

8    effect, the company's saying that lack of notice on your

9    part within the 48 hours that they're establishing here,

10   would result in your termination.  Isn't that correct?

11   A.   Correct.

12   Q.   You expressed to Miriam Diaz that since you had never

13   received this letter, and that since you had been sick, as

14   you've testified, that your dismissal was unfair.  Is that a

15   fair statement?

16   A.   That's correct.

17   Q.   And the next contact that you had with her after she

18   informed you that she would be contacting Walgreens'

19   lawyers, the next contact you had from Walgreens is that you

20   received a telephone call from Mr. Edwin Figueroa, correct?

21   A.   Correct.

22   Q.   And that's what led to the meeting that you had with

23   Melvin Rodriguez and Edwin Figueroa on the 4th of June,

24   correct?

25   A.   That's correct.

— 10/19/10 —

ADD.   18

1    Q.   Now, isn't it a fact that you were informed at the

2    outset of that meeting that what they wanted to do was to

3    hear what it was that you had to say.  Isn't that a fact?

4    A.   That's correct.

5    Q.   And that the reason why they wanted to hear was so that

6    they could verify whatever facts you brought to their

7    attention.  Isn't that correct?

8    A.   That's correct.

9    Q.   And that's where you informed them of the following:

10   First, that you had given Mariel Colon the medical

11   certificate from Damas on the 17th of May, correct?

12   A.   That's correct.

13   Q.   And, second, that your spouse had spoken with Giovanni

14   Rivera on May 10 and informed of your hospitalization,

15   correct?

16   A.   That's correct.

17   Q.   And what they set out to verify was precisely those two

18   statements that you made, correct?

19   A.   Yes.

20   Q.   And in doing that, they gathered statements -- withdraw

21   the question.

22           In carrying out their investigation, they gathered

23   statements, isn't that true?

24           MR. ACEVEDO:  Objection.  Foundation.

25           MR. USERA:  If he knows.

─── 10/19/10 ───

ADD.   19

1    Your Honor, that's actually a little bit more legible.  We

2    can perhaps work with the translation up front.

3              THE COURT:   If the witness reads English you can

4    use the translation.   If not, you'll have to go to --

5              MR. USERA:   Let me use the Spanish.

6    BY MR. USERA:

7    Q.   According to what Mr. Giovanni Rivera says here, he

8    claims -- and I direct your attention to right here

9    (indicating) -- he attributes to you you're mentioning that

10   he would be questioned regarding the notice through your

11   wife, the notice that she gave by telephone regarding

12   yourself.

13              So far you agree that that's what he's saying?

14   A.   That's correct.

15   Q.   And then he says that he told you that your spouse had

16   never spoken to him.  And then he says that he did not know

17   of your condition and so forth.  The document continues.

18              So, in effect, what Giovanni Rivera is saying, is

19   that he would be questioned as part of the investigation

20   regarding the phone call that your wife supposedly made on

21   the 10th of May.  Is that correct?

22   A.   That's correct.

23   Q.   And, in effect, you're telling Giovanni Rivera:  Hey,

24   they're going to ask you about that.  So he could confirm

25   it.  Correct?

```
1    A.   That's correct.

2    Q.   You're aware that Mariel Colon denied in her statement

3    that she had received from you a medical receipt on the 17th

4    of May, correct?

5             MR. MARTINEZ:  Your Honor, if we're going to go to

6    the contents of the statement, we can go forward, and we

7    have no problem that it be admitted.  And then we go from

8    the statement to whatever Mariel said.

9             MR. USERA:  It would be Identification I, which

10   would then become --

11            THE COURT:  That would be Exhibit I, as in Idaho.

12   BY MR. USERA:

13   Q.   Do you recognize this as the statement that Mariel Colon

14   gave that you have seen?

15   A.   Yes.

16   Q.   On the 4th of June.  Correct?

17   A.   That's correct.

18   Q.   Part of the investigation that Walgreens was carrying

19   out.  Correct?

20   A.   That's correct.

21   Q.   And she says here, and I direct your attention:  He

22   shows me a medical order.  Correct?

23   A.   I'm sorry?  Could you repeat the question?

24   Q.   Sure.  She says here that you showed her a medical

25   order.  Correct?
```

```
 1    A.   That's correct.

 2    Q.   Okay.  And also says, in effect, that at no time did you

 3    provide her a medical certificate or told her the date in

 4    which you would return.  She says that there, isn't that

 5    correct?

 6    A.   That's correct.

 7    Q.   Okay.  So the information that Walgreens is gathering in

 8    their investigation has you saying that you gave Mariel

 9    Colon a medical certificate, true?

10    A.   That's correct.

11    Q.   And that your wife called Giovanni Rivera on the 10th,

12    right?

13    A.   That's correct.

14    Q.   And when they verified, they found out from Mariel Colon

15    that she never received a medical certificate from you.

16    Correct?

17            MR. MARTINEZ:  Objection, Your Honor.  We were

18    talking about the statement, and now he's referring to a

19    "they."  We don't know who "they" is.  And we believe that

20    the document -- the declarant is Mariel Colon-Santiago.

21            THE COURT:  Rephrase.

22            MR. USERA:  I'll rephrase, Your Honor.

23    BY MR. USERA:

24    Q.   The information that Edwin Colon (sic) and Melvin Rivera

25    received from Mariel -- excuse me.  Withdraw the question.
```

──── 10/19/10 ────

ADD.   22

```
 1              The information that Edwin Figueroa and Melvin
 2      Rodriguez received from Mariel Colon, as arises from the
 3      statement, is that she had not received the medical
 4      certificate from you.  Correct?
 5      A.   That's correct.
 6      Q.   And from the statement that we saw from Giovanni Rivera
 7      that he had never received any call from your wife, correct?
 8      A.   That's correct.
 9      Q.   And that he had, indeed, received the call from you
10      confirming that he had received that call, correct?
11      A.   That's correct.
12      Q.   You were called into the company on the 6th.
13      A.   That's correct.
14      Q.   And you were called in by Edwin Figueroa.
15      A.   That's correct.
16      Q.   And that's when he met with you and the regent, Suarez,
17      correct?   Regente.
18      A.   That's correct.
19      Q.   And informed you that you were being separated for
20      dishonesty, correct?
21      A.   That's correct.
22      Q.   So following Miriam Diaz's meeting with you, the company
23      gave you an opportunity to explain and the conclusion was
24      that you had been dishonest, correct?
25      A.   That's correct.
```

—— 10/19/10 ——

ADD.    23

```
 1              (Pause.)
 2    Q.  Mr. Pagan, part of the evidence that your attorney
 3    submitted in this case was evidence related to your request
 4    for unemployment benefits.  Is that correct?
 5    A.  Yes.  That's correct.
 6    Q.  And regarding the portion of the document that was shown
 7    here in court, it establishes that Walgreens was giving you
 8    a reconsideration of the decision to terminate you.
 9    Correct?
10    A.  That's correct.
11    Q.  You do not know the reason that Walgreens had for
12    dismissing you, correct?
13    A.  Yes.  I know the reason.
14    Q.  The reason that they articulated to you was your
15    dishonesty, correct?
16    A.  No.  First they terminated me because I disappeared.
17    Then after they made the investigation they terminate me for
18    dishonesty.
19    Q.  What was being reconsidered, as stated to the labor
20    department, was the decision of separating you for having
21    disappeared.  Correct?
22              MR. MARTINEZ:  Objection, Your Honor.
23              THE COURT:  Don't answer.
24              MR. MARTINEZ:  The objection is that the documents
25    that, at least have come into evidence, do not establish
```

—————— 10/19/10 ——————

ADD.    24

1    that at the department of labor there was ever any mention

2    about reconsideration.

3                THE COURT:  Okay.  Rephrase the question.  You can

4    ask this line of questioning, but you have to rephrase.

5    BY MR. USERA:

6    Q.  According to the unemployment documents that we saw this

7    morning -- excuse me -- that we saw yesterday when Edna

8    Reyes from the department of labor testified, Walgreens

9    originally stated that your separation was for your having

10   disappeared, correct?

11   A.  That's correct.

12   Q.  And that --

13               THE COURT:  Counsel, just for the record, what

14   exhibit is that you're referring to?  I know it's in

15   evidence.  Just for the sake of the record.

16               MR. USERA:  The exhibit is Plaintiff's 5,

17   Your Honor.

18               MR. MARTINEZ:  Exhibit 5.

19               MR. USERA:  As has been redacted, or to be

20   redacted.  Exhibit 5.

21               THE COURT:  Okay.  That's the one that witness was

22   presented with -- the witness of that -- the testimony of

23   that witness you just mentioned.  Continue.

24   BY MR. USERA:

25   Q.  And what is reflected in the labor department document

──────────── 10/19/10 ────────────

ADD.   25

```
1     is to the effect that they were asking you to come back in

2     to give additional facts regarding your absences, correct?

3     A.   Yes.   That's correct.

4     Q.   And that after that they would take a decision, correct?

5     A.   They had already made a decision.

6     Q.   But the document states that what was being represented

7     to the labor department was that they would take a decision

8     after you provided additional facts.   Isn't that correct?

9     A.   Correct.

10    Q.   And then after the meeting took place on the 4th, they

11    informed the labor department on the 6th that you were being

12    separated for dishonesty, correct?

13    A.   That's correct.

14    Q.   Thank you.   Now, Mr. Pagan, I want to talk to you about

15    the period before May, 2008, okay?

16         MR. MARTINEZ:   Your Honor, we have an objection to

17    the evidence regarding that period.

18         THE COURT:   Okay.   I think it's a good time for

19    the jury's break.   And I will hear from counsel when the

20    jury recesses.   So let's excuse the jury.   The witness is

21    under rules of the court.

22         (NOTE:   The jury exiting the courtroom at

23    2:58 p.m.)

24

25         (NOTE:   The following proceedings were held
```

---------------- 10/19/10 ----------------

ADD.   26

1    Q.    And the rationale behind the rule is for the employer to

2    be able to find replacements of the absent employee,

3    correct?

4    A.    That's correct.

5    Q.    And if we focus on the last paragraph at the very end it

6    says that whatever medical certificate you bring -- or the

7    employee brings -- has to be notified to the manager or the

8    assistant.  Isn't that correct?

9    A.    That's correct.

10    Q.    Wanda Santiago was not a manager, was she?

11    A.    That's correct.

12    Q.    She wasn't an assistant manager, either, was she?

13    A.    No.

14    Q.    She was a regular hourly employee, isn't that correct?

15    A.    That's correct.

16    Q.    Now, Mr. Pagan, I direct your attention, please, to page

17    172.  And specifically to the paragraph third from the

18    bottom that starts with:  "There are certain types of

19    conduct."

20          Do you see it there?

21    A.    Yes.

22    Q.    The policy considers that there can be certain conduct

23    that justifies separation from one offense, is that correct?

24    A.    That's correct.

25    Q.    And if we go to the following page, page 173, the fourth

— 10/19/10 —

ADD.    27

1    bullet says that committing -- with dishonest acts, or those

2    that affect Walgreens assets, are such grounds.  Correct?

3    A.   That's correct.

4    Q.   And committing dishonest acts was the reason that was

5    articulated to you by Edwin Figueroa for your separation on

6    the 6th of June, is that correct?

7    A.   That's correct.

8                  MR. USERA:  Let me recover the document.  Thank

9    you very much, Mr. Pagan.

10                 I don't have any other questions.

11                 THE COURT:  Redirect, I normally give the parties

12   five minutes.  But if you need a little longer, please go

13   ahead.  Want to see if we can conclude with the witness this

14   afternoon.

15                 MR. ACEVEDO:  Your Honor, at this point before we

16   continue -- we begin with the redirect, we would like the

17   Court to make some judicial notice of federal regulations.

18   I don't know if we should do that --

19                 THE COURT:  Please approach first.

20

21                 (Discussion at the bench on the record:)

22                 MR. ACEVEDO:  This is the only copy --

23                 THE COURT:  Mr. Acevedo.

24                 MR. ACEVEDO:  Attorney Acevedo.  This is the only

25   copy we have of CFR 825.303.  We would like to make judicial

─────────────── 10/19/10 ───────────────

ADD.   28

Exhibit 3

PROGRAM ID:                    TIME & ATTENDANCE STORE 00368              RUN DATE:   5/.
PROCEDURE:                           T I M E   C A R D                   RUN TIME:  11:3..3

NAME: PAGAN J
PERIOD ENDING:  5/16/08          SOC SEC NO.  ***-**-4019          PAY CLASS:  FR1
                                                                   HRS DATE:   9/02/00

| DATE | PAY CLASS | LOC | DEPT | EARN CODE | TIME IN | R C | START LUNCH | R C | STOP LUNCH | R C | TIME OUT | R C | DAILY HOURS | R C |
|------|-----------|-----|------|-----------|---------|-----|-------------|-----|------------|-----|----------|-----|-------------|-----|
| 5/10/08 | FR1 | 00368 | MGT | 27 | | | | | | | | | 03:00 | * |
| 5/10/08 | FR1 | 00368 | MGT | 01 | 04:00 | | | | | | | | 05:00 | * |
| 5/11/08 | FR1 | 00368 | MGT | 27 | | | | | 09:01 | * | | | 08:00 | * |
| 5/12/08 | FR1 | 00368 | MGT | 27 | | | | | | | | | 08:00 | * |
| 5/13/08 | FR1 | 00368 | MGT | 27 | | | | | | | | | 08:00 | * |
| 5/15/08 | FR1 | 00368 | MGT | 27 | | | | | | | | | 08:00 | * |

NOTE: ROUNDED PUNCHES EXIST

                          TOTAL DAILY HOURS    40:00
                          TOTAL LUNCH HOURS    00:00

|              | -----TIME----- | | | -----PREMIUMS----- | | |
|--------------|----|------|-------|-------------|----|-------|--------|
| DESCRIPTION  | BC | DAYS | HOURS | DESCRIPTION | BC | HOURS | AMOUNT |

LOCATION......00368
WEEK#.........1
REGULAR EARNINGS    01      5.00
SICK PAY HOURS      27     35.00

ADD.    29

CONTINUED ON NEXT PAGE

I CERTIFY THAT THE ABOVE PUNCHES, HOURS, AND DOLLAR AMOUNTS ARE CORRECT:

SUZAN PAGAN

APPROVED:                                      MANAGER

PROGRAM ID: 7   TIME & ATTENDANCE STATUS 00368   RUN DATE: 5/1
KEYCHEUNE: VA   T I M E   C A R D   RUN TIME: 11.35

NAME: PAGAN, J
PERIOD ENDING: 3/16/08   SUC SEC NO: ***-**-0019   PAY CLASS: PRL
   HIRE DATE: 9/02/00

COMPARED FROM PREVIOUS BACK · · · ·

| DESCRIPTION | EC | AMOUNT | HOURS | DAYS |
|---|---|---|---|---|
| LOCATION.....00368 | | | | |
| WEEK4.........2 | | | | |
| INCR PAY HOURS | 27 | $ 50.80 | 4.00 | |

I CERTIFY THAT THE ABOVE TIMES, HOURS, AND DOLLAR AMOUNTS ARE CORRECT
PAGAN
APPROVED:
MANAGER

ADD. 30

*Exhibit 5*

R-SD 518C
(Rev. 4/98)

02-024-0 _____ **Certified Translation**

(Note: the following pages are
Bates stamped 000237-000240)

Commonwealth of Puerto Rico
Department of Labor and Human Resources
Bureau of Employment Security
Unemployment Insurance Division
Hato Rey, Puerto Rico

DISMISSAL  DATA  SEARCH  INTERVIEW

Name  Juan C. Pagán Colón Social Security_____ Office 2102
Note: You informed that you were dismissed from your job.  To issue a
determination in your case, it is necessary for you to answer questions 1
through 18.
1. Your last employer was: Name of the company Walgreens
795-4200   Address: Juana Díaz, P.R.
ext. x 233  Telephone  837-7080   Name of the immediate supervisor -
Juana Díaz                          Edwin Figueroa

2. Time that you worked for this employer: From (month)  9   (day)  5
(year) 2001   Until (month)  5   (day)  24   (year)  2008 .

3. What was your salary? $12.70 [X] per hour [ ] daily [ ] weekly
 [ ] biweekly [ ] monthly [ ] annually

4. What was your work schedule? HOURS: From Rotating work shifts To
(Full-time).                          DAYS: From_____ To_____

5. What was your occupation? _ Assistant to the Manager

[1]

## EMPLOYER'S   REPORT

6/3/08, 9:32 a.m.  I left a message on the recording machine of Miriam Díaz from Human Resources.

6/4/08, 8:35 a.m. Frank Bear (attorney for Walgreens) returned our call. He explained that this employee was separated from the job due to abandoning his job. He (Mr. Pagán Colón) disappeared for two weeks without notifying anything to the manager.  When he came back, he brought a medical certificate. Our procedure establishes that he has to get in touch with the manager so that the latter can make arrangements. I don't know why he did not get in touch with the manager.  We summoned him to an interview to give him the opportunity to explain to us. We will reach a decision.

6/6/08, 9:06 a.m. Attorney Frank Bear called us, informing us that on June 4, they interviewed employee Juan Pagán but that he (Pagán) lied since he indicated that he had informed his absences to three persons at the store. These persons were interviewed and they denied that he had gotten in touch with them.  We were willing to reinstate him and only give him a written one, but he was dishonest and we lost trust in him. An employee even told us that half an hour before the interview, he (Mr. Pagán) had called him asking the employee to lie. This is why we fired him, because of dishonesty.

_____
Signature of the interviewer

`[7]`

ADD.  32

**I  CERTIFY that the preceding text is a faithful and true translation of its original as it appears in the Spanish language.**

*Patricia Beckerley*
Certified Court Interpreter
Administrative Office of the
U.S. Courts

[ 8 ]

Exhibit 6

## Cash Salary

*only for paychecks that will not be processed. Do not use for delayed payroll checks.*

Employee Id: **583914019**                Employee Name: **JUAN PAGAN**
Store#: **368**                Avg. Hours: **46.50**                Hourly Rate: **$12.70**
Cash Salary Date: **6/10/2008**                Pay period ending: **5/23/2008**                Reason: **Missing Time**

| Earnings | Amount | Charge Loc. Taxes | Amount | Deductions | Amou |
|---|---|---|---|---|---|
| Regular Hours: | 4    $50.80 | Fed Tax | $0.00 | P/S - PR | $12. |
| Regular Hours: | | FICA | $37.80 | VIP | $50. |
| Regular Hours: | | Medicare | $8.84 | | |
| Regular Hours: | | State Tax | $60.80 | | |
| Overtime Hours: | | Local Tax | $0.00 | | |
| Vacation Hours: | | Sp. Local Tax | $0.00 | | |
| Sick Days: | | Disability | $0.00 | | |
| Sick Hours: | 44    $558.80 | | | | |
| Other: | | | | | |
| Other: | | | | | |
| Other: | | | | | |
| Other: | | | | | |
| Total Earnings | $609.60 | Total Taxes | $107.44 | Total Deductions | $73.1 |
| Total Net Pay: | $429.01 | | | | |

Employee Signature :

ADD.  34

EXHIBIT A

# WELCOME TO THE *Walgreens*
## Orientation Manual

### For employees of Walgreens pharmacies in Puerto Rico

Bates stamped 155

ADD.  35

## Rules and Norms of the Company that rule the conduct of the employees

### Progressive Discipline

Walgreens forbids favoritism at the work site. A fair program of discipline allows the employees to know what is expected from them and what they can expect if they do not follow norms, rules or if they perform their work in a negligent or tardy manner against Walgreens' norms of quality service. Generally, an employee is not fired for a single violation to the policies, rules or norms of the company. In the majority of the situations in which some policy, norm or expectation of the company is violated, it is recommended that the following steps be followed:

1. <u>First violation</u>: The Manager or the assistants orient the person verbally and document that is was done so.

2. <u>Second violation</u>: The Manager or the assistants have to give an employee a written warning. Said warning has to include as minimum (a) a history record of previous discipline, (b) a summary of the norm violated, © date and specific facts that imply actual discipline, (d) how was it concluded that the norm had been violated, and (e) warning of future consequences if the person commits any similar violation in the future.

3. <u>Third violation</u>: The Manager or the assistants have to give the employee a final warning with or without suspension, in the form of a written warning. The warning has to include as minimum (a) a history record of discipline, (b) a summary of the norm violated, © date of, and specific facts that imply discipline, (d) how was it concluded that the norm was violated, and (e) warning of consequences to follow if the person commits any similar violation in the future.

4. <u>Fourth violation</u>: Termination of employment.

**Opportunity to Explain:** It is expected that every employee cooperate with the internal processes of investigation which imply the possibility of discipline. Every employee shall have the opportunity to respond at any step of progressive discipline. In the event that the person does not cooperate, they will be suspended without pay until a determination is made based on the information obtained.

16                                                              Bates stamped 172

## Conduct Which Justifies the Termination of Employment

There are certain types of conduct which affect the working environment or the operations of the pharmacies, which, depending on the severity and other circumstances, could imply immediate dismissal for the employee although it may be an isolated fault. These include, but are not limited to:

* Any type of physical violence on Walgreens premises.

* Bearing firearms, knives, explosives or any other dangerous weapon on Walgreens premises.

* Consuming alcoholic beverages or using forbidden narcotics on Walgreens premises.

* Using obscene , threatening words, or making indecent or hostile gestures on Walgreens premises.

* Participating in games of chance or placing  bets in Walgreens during working hours.

* Committing dishonest acts or those which affect Walgreens' assets.

* Punching the time card of another employee or allowing in some way that another employee punches yours and that it results in reporting false work hours.  This shall be considered a dishonest act and one of fraud against Walgreens.

* Destroying or stealing property belonging to Walgreens or to another person on Walgreens premises.

* Mistreating or being disrespectful to any client.

* Gross insubordination or intentional disobedience to an order, task or managerial instruction related to work.

* Consuming merchandise before paying for it or allowing someone to do the same.

* Harassment, Discrimination or Reprisal in violation of Walgreens policies.

17                                                            Bates stamped 173

* Violating the Photo developing confidentiality policy.

* Violating the policy regarding the Handling of Photo developing where there is nudity and/or explicit sexuality.

* Working more hours or hours that are different from the ones that are annotated in your card of hours worked.

* Discrimination for military service or for any other condition protected by the law.

* Give employee or professional discount to persons who do not qualify for said discounts or cause or allow another employee to give employee or professional discount to persons who not qualify for said discounts. To violate this norm is considered an act of dishonesty against Walgreens' assets.

* Negligence that may impose legal liability on or cause losses to Walgreens.

* Violate the labor laws of Puerto Rico or cause another employee to violate said laws or Walgreens' norms.

17                                          Bates stamped 173

## Receipt of Orientation Manual

I, Juan Pagán , (Print Name): (JCP initials), (Social Security),

acknowledge that on the 12th day of November of 2007, I received the

Walgreens Orientation Manual for Puerto Rico employees.

---

BY means of my signature, I give faith that I shall read and analyze

the Walgreens Orientation Manual and that I will bring to the attention

of my Manager or Assistant Manager any doubt or question that I have

regarding said Manual and the information contained in it.

Signature: _____ (signed by Juan Pagán)

Date:        11/12/07

Rev. 09/2007

(Note: stamped (illegible) 00368

(Handwritten note: Juan Pagán
            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)

(The page is Bates stamped 71 on its bottom right-hand corner).

## I  certify that the foregoing is a faithful and true translation of its original in Spanish.

*Patricia Beckerleg*
*Certified Court Interpreter and Translator*
*Administrative Office of the US Courts*

ADD.  39

May 19, 2008                                    (Illegible)


As you know, you have not reported yourself to work after having

left on May 10 due to illness.  As of today, you have not gotten in touch with

Mr. Edwin Figueroa or with Mrs. Miriam Díaz to determine your eligibility for

the DISABILITY LEAVE.

~~Therefore, at this time you are not covered under any benefit.  Please~~

call Mrs. Miriam Díaz immediately at 795-4200 to apply for the DISABILITY

LEAVE.

To not communicate with your Manager immediately within a period

of 48 hours beginning on May 19 may bring negative consequences for your

job, being considered as voluntary abandonment of work.  By these means, I

exhort you to get in touch with us to know your status with regard to your

job or you can send us a medical certification.  I am also informing you that

you are entitled to SINOT (Disability Benefits Leave) and ACCA.

Awaiting your prompt attention,

(signed)
Edwin Figueroa (Manager)

**I CERTIFY that the preceding document is a faithful and true
translation of its original in Spanish.**

*Patricia Beckerleg*
**Certified Court Interpreter**
**Administrative Office of the US Courts**


Bates stamped 3

June 4-2008

From:   Assistant  Juan  C. Pagán

Re: Meeting Mr. Figueroa and Mr. Rodríguez

June 4, 2008    Meeting: Dismissal from my job.

Today I was laid off.  (Illegible)

~~Dialogue about the problems and about my dismissal at Walgreens.  I was~~

in the hospital 7 days.  7 days of rest with a medical certificate from Dr.

Rivera.

Saturday, May 17 - I hand in the medical certificate to Mrs. Mariel Colón,

in the presence of Mrs. Wanda Santiago.

(Bates stamped 22).


CERTIFIED  TRANSLATION  BY  *Patricia Beckerleg.*

6/4/8

Mr. Melvin Rodríguez had an appointment with Mr. Pagán at the Juana Díaz Walgreens office. I was resting and the cell phone rang and it was Mr. Pagán at 12:08 p.m. of 6/4/8. He mentioned that they would be asking me about notifying via his wife, Mr. Pagán's telephone excuse with my person and I told them that his wife never spoke with me nor did I know about his condition, only when one day I found out about him when, one closing day, I called him and also prior to that via Iris, an employee from (illegible) that he was hospitalized. Later on, I was summoned to the office and Melvin asked me whether his wife or he had called excusing themselves, to which I said no.

(Bates stamped 22)

**CERTIFIED  TRANSLATION  BY** *Patricia Beckerleg.*

EXHIBIT I

**TRANSLATION**

(Handwritten page)

June 4, 2008

During my work shift, I was in the front part of the store accommodating the merchandise, since it was my turn to do the store closing. Later, I saw that Mr. Pagán entered with his two children. I was very glad to see him and quickly asked him when was he coming back, since I had been closing for several days and was quite exhausted. He replied that he did not know, that he was going to the prescription dispatch area for some prescriptions. He continued on his way toward the prescription dispatch area and I did not see him again, until I went into the office and there he was with other employees. I asked him again when was he coming back and he said that he did not know. He showed me a medical order that he said was for studies, and that the same were to be done the next week and that it depended on what the doctor said. Afterwards, I did not hear anything more about or from him. At no moment whatsoever did he hand me a medical certificate or gave me a date for his return. He did not leave me a message with regard to the time that he would be absent from the store.

(Signature of Mariel Colón Santiago)

**Certified translation by** *Patricia Beckerleg.*

*(Bates stamped 21)*

## JURY INSTRUCTION # 19

### Proving a Case of Retaliatory Dismissal under the FMLA

In order to prevail in a case for retaliatory dismissal under the FMLA an employee must establish that:

1.    he or she engaged in a protected action;

2.    he or she suffered as adverse employment action, such as being fired; and

3.    there is a causal connection between the employee's protected activity and the employer's adverse employment action.

The employer may prevail by showing that the dismissal was not due to the employee's exercise of his or her rights to a medical leave, but rather because of a legitimate non-discriminatory reason. An employer articulates a legitimate non-discriminatory reason for termination where it has an honest, good faith belief for termination, even if it turns out to that the employer was mistaken in that belief. The employee may discredit the employer's purported legitimate reasons by showing that they are nothing but a pretext for retaliation. If you find that the employee proves, by a preponderance of the evidence that the employer's reasons are pretextual then the plaintiff may prevail.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JUAN C. PAGÁN COLÓN, ADA I. RENTA BONILLA and THE CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM | CIVIL No. 08-02398 (GAG) |
| Plaintiff | FEDERAL MEDICAL LEAVE ACT |
| v. | |
| WALGREENS of SAN PATRICIO, INC. | JURY TRIAL DEMANDED |
| Defendants | |

### STIPULATED FACTS

1. On September 2, 2000, Juan C. Pagán-Colón was hired by Walgreens as an Assistant in the Department of Photo Development in the Walgreens pharmacy in the Commercial Plaza in Juana Díaz.

2. In 2001, Juan C. Pagán-Colón was promoted to Assistant Manager in the Walgreens store in the Commercial Plaza in Juana Díaz.

3. Since his promotion, Juan C. Pagán-Colon has worked at various Walgreens stores in Ponce and Juana Díaz. In the year 2006, Juan C. Pagán-Colón was transferred to Walgreens store in Juana Díaz.

4. On May 10, 2008, Juan C. Pagán-Colon was scheduled to work the 4:00 a.m. to 2:00 p.m. schedule with a break from 8:00 a.m. to 9:00 a.m.

5. During the 12-month period immediately before May 10, 2008, Juan C. Pagán-Colón worked a total of 2,263.20 hours.

6. The phone numbers for the Walgreens store in Juana Diaz as of May, 2008 were (787) 837-7080 and (787) 837-1090.

7. On May 16, 2008, Juan C. Pagán-Colón underwent a cardiac catheterism and received anesthesia.

8. On May 17, 2008, Juan C. Pagán-Colón visited Walgreens store in Juana Diaz.

9. Pursuant to a Walgreens' video recording of May 17, 2008, on such date Juan C. Pagán-